**Robert Leon JENKINS, a minor, by his mother and next friend, Roberta B. Jenkins, Appellant,**

v.

**F. W. AVERETT, Appellee.**

**No. 13627.**

United States Court of Appeals, Fourth Circuit.

Argued Dec. 3, 1969.

Decided April 20, 1970.

---

Albert V. Bryan, Circuit Judge, dissented in part.

James E. Ferguson, II, Charlotte, N. C. (Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., Conrad O. Pearson, Durham, N. C., Robert Harrell, Asheville, N. C., Jack Greenberg and Michael Meltsner, New York City, on brief), for appellant.

F. W. Averett, appellee, did not file a brief and did not appear for argument.

Before SOBELOFF, BRYAN and BUTZNER, Circuit Judges.

SOBELOFF, Circuit Judge:

The subject matter of this appeal is an occurrence in Asheville, North Carolina, on August 5, 1967. On that night, appellant, Robert Jenkins, an 18-year-old black youth, was shot by F. W. Averett, appellee, a white Asheville police officer. Jenkins had committed no crime nor was he ever charged with one. Subsequently, he sued Averett in the United States District Court to recover damages for violation of his constitutional rights under 42 U.S.C. § 1983 and for assault and battery under a pendent claim based upon the law of North Carolina. The District Court rejected the section 1983 claim but found defendant liable in the state cause of action. The assessment of compensatory damages, however, was limited to out-of-pocket expenses, in the amount of $448.00. Nothing was allowed for pain and suffering.

# I

## *Factual Setting*

### A. *The Evidence*

Between midnight and 1:00 a.m., on the night in question, Jenkins was walking home from a club in the company of three or four other Negro boys. They had not proceeded far when they were overtaken by a car filled with white boys who hurled racial taunts as they sped past. The automobile returned in short order. This time one white boy got out and threw a tire tool, which hit one of Jenkins' companions on the leg.

The tire tool, which became the focal point of the ensuing events, and later of this litigation, is a metal bar with a bend or crook. Its length is about 18 inches.[1] Plaintiff retrieved the thrown tool and pursued the automobile on foot by himself. After rounding a street corner he lobbed the bar at the speeding vehicle, but missed. His adversaries, however, evidently noting that he was now alone, stopped and began to pelt him with beer bottles.

Jenkins retreated around the corner to enlist his colleagues. He was joined by his friends and approximately ten other Negro boys who happened upon the scene. They rushed the seven or eight white boys, who now scurried away.

It was at this point, while the group of black youths was still milling about, that the squad car containing appellee Averett and his partner, Officer Bumpus, pulled up across the street. They had come in response to a radio call addressed to another police patrol. When the boys saw the police they began to scatter. It was Jenkins who sought to restrain them, admonishing that having done no wrong they should not run. Finally, when the last boy, whom Jenkins had grabbed by the arm, broke away, Jenkins as well flew. He still had the tire tool, and according to his version, ran with it in his hand.

When the police first arrived they perceived no wrongdoing. But Averett claims that he saw Jenkins stuff something into his pants leg before bounding off and that across the concededly fairly well lit street it looked to him like a gun. Officer Bumpus saw neither gun nor tool. According to his testimony, what he saw appeared to him like a boy tucking his shirt in.

The officers in their automobile went in pursuit of Jenkins. Jenkins thinks he was selected simply because he was the last to leave the scene. Averett says that the young man was singled out for pursuit because he was a suspected gun wielder. At any rate Jenkins ran some distance. In fact, for six blocks he outran the police car which, according to Averett, was moving at a fast pace. Averett claims that all along the implement was concealed in Jenkins' trousers. He offers no explanation of how a man could run, indeed run so well, with a long metal bar in his pants leg.

The squad car finally caught up with appellant when he darted down a narrow lane. The police vehicle turned in and Jenkins, according to defendant's testimony, was caught against a wall in the squad car's headlights and "almost under the street light." Significantly, Averett acknowledges that the tool was now out and visibly in plaintiff's hand. But even with the aid of the street light and the direct beam of the headlights, Averett, we are told, still could not discern that the tire tool was not a gun.

Jenkins now reversed direction and came back toward the car in order to turn out of the street. He passed Bumpus' (the driver's) side of the police vehicle and continued to run. Averett got out, drew and cocked his pistol, and then chased his quarry about 60 feet. Averett says that as he ran he continued to be unable to espy the character of the article in Jenkins' hand. The officer yelled "halt" and Jenkins halted, appar-

---

1. As the tire tool was produced at trial, none of the recorded testimony addresses itself to the precise dimensions of the implement. In his description, the District Judge put it at 12 to 18 inches. By contrast the Chief of Police in his deposition said it was "about 18 inches long, maybe 18 to 24."

ently in the light. According to all the witnesses, including Averett, Jenkins then dropped the tire tool and turned to face his pursuer. The tool made a distinct noise upon falling that was heard all around, and even Averett recalls that it dropped. Only a few feet away, and two or three seconds later, Averett relates, he lowered his gun, and in doing so accidentally pulled the trigger, putting a hole through Jenkins' thigh.

The appellant maintains that the shooting was deliberate. Indeed he testified that after he was shot, appellee took aim again, but by that time Bumpus, who had now also left the police car, appeared, and Averett then lowered the gun.

The two officers placed the wounded man in the back of the police car. Jenkins claims that Averett said, "You better be glad my gun wasn't pointed at your God damned belly or you would have been dead." The policeman admits having said that his captive was indeed lucky that the shot did not hit him in the stomach. At trial, Bumpus corroborated this milder version although in his pretrial deposition he had disclaimed any memory of such a statement.

Jenkins was not taken to the hospital immediately. Instead, although admittedly not according to police procedure, the officers drove to the police station first so that Averett could report in and ask for "advice" on what to do about the bleeding boy in his custody. Averett concedes that this could have been accomplished as well by radio.

B. *The Findings of the District Court*

■ The District Judge generally credited defendant's story. He found that Averett suspected that Jenkins had a gun. He also found that Averett did not intend to shoot plaintiff. On the other hand, the District Judge found that defendant was grossly or culpably negligent. This finding is well supported by the record. Therefore, as will presently appear, there is no need to examine the other findings.

II

*The State Claim*

■■ The District Judge held in favor of the plaintiff on the pendent state claim for assault and battery. Acknowledging that ordinarily intent is a necessary element in assault and battery, the court relied on the principle that gross or culpable negligence may supply that intent. This is a correct statement of the general rule. State v. Eason, 242 N.C. 59, 86 S.E.2d 744 (1955); State v. Agnew, 202 N.C. 755, 164 S.E. 578 (1932); State v. Sudderth, 184 N.C. 753, 114 S.E. 828 (1922). Moreover, with more particular reference to the facts of this case, it is settled in North Carolina that a police officer is liable for assault if he "arbitrarily and grossly abuse[s] the powers confided to him" State v. Pugh, 101 N.C. 737, 7 S.E. 757 (1888); State v. Dunning, 177 N.C. 559, 98 S.E. 530 (1919). "A grossly unnecessary, excessive, and wanton exercise of force would be evidence—strong evidence" of abuse, to be weighed by the finder of fact. State v. Pugh 101 N.C. at 738, 7 S.E. at 758; Perry v. Gibson, 247 N.C. 212, 100 S.E.2d 341 (1957). In the present case no force was needed to restrain Jenkins. Since use of the unnecessary force was correctly found by the court below to amount to gross or culpable negligence, the imposition of liability on this count is affirmed.

III

*The Federal Claim*

The District Judge was of the opinion that Jenkins should not prevail under federal law. We do not agree, and hold that plaintiff has established the elements of recovery under 42 U.S.C. § 1983.

A. *The Constitutional Deprivation*

■ The constitutional right to be free from unreasonable interference by police officers is incontrovertible. The Constitution has long been interpreted to embrace security from "arbitrary intrusion by the police." Wolf v. Colora-

do, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1948). This concept was reaffirmed when Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), made the Fourth Amendment fully applicable to the states. It should not be forgotten that the Fourth Amendment expressly declares "the right of the people to be secure in their *persons* * * * against unreasonable searches and seizures." And "this inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." Terry v. Ohio, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968).

█ It is likewise clear that this shield covers the individual's physical integrity. Injuries arbitrarily inflicted by the police are constitutionally cognizable and remediable. Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L. Ed. 1495 (1941); Stringer v. Dilger, 313 F.2d 536 (10th Cir.1963); Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L. Ed.2d 136 (1961); Jackson v. Duke, 259 F.2d 3 (5th Cir.1958); Brooks v. Moss, 242 F.Supp. 531 (W.D.S.C.1965); Jackson v. Martin, 261 F.Supp. 902 (N.D. Miss.1966).

█ As the District Court recognized, our plaintiff was subjected to the reckless use of excessive force. The wound he suffered was a result of unreasonable—or, to use the apt terminology of the District Court, "gross or culpable"—conduct of the defendant police officer. This arbitrary action was a constitutional violation.

The dissent maintains that arbitrariness is not the same as negligence. We agree. But we deal here not with simple neligence or inadvertence. The injury in this case could be called "accidental" only in the sense that it was not specifically intended; it was, however, the direct consequence of defendant's wanton conduct in the course of his attempt to apprehend the plaintiff.

As we have seen, state common law posits arbitrary and gross abuse of police power as a *sine qua non* to recovery. Our affirmance of state liability is on the premise that the "gross or culpable" finding is the equivalent of a finding of arbitrariness. We propose at this juncture only to utilize the same finding in applying federal law.

Thus, we emphatically reject the spectre raised in the dissent that our opinion contemplates a constitutional remedy for all state-perpetrated negligence. Our concern here is with the raw abuse of power by a police officer —as found by the District Judge—and not with simple negligence on the part of a policeman or any other official. We have no occasion to speculate about cases that are not before us.

**B.** *The Relevance of Intent to Injure Under Section 1983*

Having established the deprivation of a secured right, plaintiff asserts that his injury is redressible under section 1983. The District Judge, however, denied relief under this section, accepting defendant's claim that he did not intend to shoot plaintiff and deeming that to be a defense.

A simple answer is that if intent is required, it may be supplied, for federal purposes, by gross and culpable negligence, just as it was supplied in the common law cause of action. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L. Ed.2d 288 (1967), discussed *infra.*

█ More fundamentally, however, after a constitutional violation has been made out, a showing of intent to injure is not a further prerequisite to recovery under section 1983. There is no longer room to doubt that one need not prove bad motive or evil intent to avail himself of the section 1983 remedy.

The actual words of the statute evince a design, without qualification, to compensate the deprivation of constitutional rights under color of law:

Every person who, under color of any statute, ordinance, regulation, custom,

or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Notwithstanding the statutory language, some courts have in the past sought to create a gloss requiring proof of ulterior purpose. *See, e.g.,* Striker v. Pancher, 317 F.2d 780, 784 (6th Cir. 1963); Hardwick v. Hurley, 289 F.2d 529, 530 (7th Cir.1961). Our view, however, is in line with significant recent authority, that such a general requirement cannot be judicially engrafted to deny compensation under section 1983 for a proven deprivation of rights. *See,* Whirl v. Kern, 407 F.2d 781 (5th Cir. 1969); Joseph v. Rowlen, 402 F.2d 367 (7th Cir.1968), (overruling Hardwick v. Hurley, *supra*). As the Fifth and Seventh Circuits have declared, constricting the possibility of recovery under section 1983 is consistent with neither the plain language of the act nor the mandate to read it "against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961).

Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, (1967), preserving to section 1983 defendants certain common law immunities, does not detract from our conclusion, but supports it. That case did not introduce into the statute an absolute shield from liability for non-malicious acts; it held only that defenses continue to exist where they existed in parallel common law causes. The lower court had imposed liability on police officers who made arrests founded upon probable cause under a statute valid when invoked but subsequently declared unconstitutional. Under the common law the officers could have defended on the basis of good faith reliance on the statute.

But the Court of Appeals was of the view that under the rule of Monroe v. Pape, *supra,* such a defense was unavailable in the federal suit. On the contrary, held the Supreme Court, Monroe v. Pape recognized that section 1983 was modeled on a "background of tort liability." *Pierson* held that common law immunities retain vitality in a section 1983 action if they could have been utilized in the cognate state action. But having been properly held liable in the common law analogue, Averett obviously can mount no such defense to the federal suit.

## IV

### *Damages*

#### A. *Compensatory*

 The District Judge limited damages to out-of-pocket expenses totaling $448.00. The award is inadequate. Indisputably, pain and suffering which accompany personal injury should be compensated. 22 Am.Jur.2d Damages, § 105, p. 154 (1965).

The evidence demonstrates that the bullet hole (six inches in depth) made by the shot caused considerable pain. The wound required constant redressing and the administration of pain-relieving drugs. Furthermore, Jenkins, a young man of some athletic ability, was prevented, because of the injury, from taking his place in scholastic athletic endeavors during his senior year of high school. On remand the court will make an award sufficient to redress fairly all the consequences of the gun wound, including pain and suffering.

#### B. *Punitive*

The court below found "no evidence in this record which would justify the awarding of punitive damages." That holding may have been influenced by the supposition that the section 1983 claim should be denied. We express no view as to the appropriateness of punitive damages in this case. That question will remain open on remand.

Affirmed in part, reversed in part, and case remanded for entry of judgment and reassessment of damages.

ALBERT V. BRYAN, Circuit Judge (concurring in part and dissenting in part):

The *result* reached by the opinion of the court is entirely acceptable to me. I unreservedly agree that the award in damages is pitifully inadequate ˙ and should be reassessed.

My departure is solely on the utilization of 42 U.S.C. § 1983 as a premise of recovery. This statute, as I understand, was never envisioned as a means of recoupment for injuries caused by the negligence of a State officer acting in the course of his duty.

Clarity in my position may be improved by reiterating the precise claim pleaded by the plaintiff, and noting the basis upon which this court now allows the Federal statute to be invoked. The shooting of the plaintiff with his subsequent arrest is the tort for which he sues. The prior pursuit of him is not pleaded as in itself tortious conduct. He was untouched until the shooting.

The shooting was determined by the District Judge to be accidental, due to gross or culpable negligence. This court agrees, saying, "He [the District Judge] *also* found that Averett [the defendant] did not intend to shoot the plaintiff. *On the other hand*, the District Judge found that defendant was grossly or culpably negligent. *This finding is well supported by the record.*" (Accent added.) Hence, neither the trial judge nor the court combines intent with negligence. Certainly actual intent is not made an element of the injurious deportment here.

Nevertheless, the court inaptly cites for its position decisions declaring that arbitrary inflictions of injury by State officers are "constitutionally cognizable and remediable". With these holdings I have no quarrel. But be that as it may, that proposition is irrelevant when the trial court and this court both put the blame upon negligence, not arbitrariness. Arbitrary "conduct [is] subject to the individual's will or judgment without restriction; contingent solely upon one's discretion". The Random House Dictionary of the English Language (Stein ed. 1966). Obviously, it does not include an accident.

Notwithstanding the majority's initial confession of accident as the exclusive ground of recovery, it now attempts to add intent as present in the shooting. It does so by giving gross and culpable negligence the identity of intent. This is the critical and overtopping infirmity of the majority opinion—an impermissible dilation of the holding of Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L. Ed.2d 288 (1967).

Contrary to the opinion of the court presently, nowhere in *Pierson* is negligence—gross or culpable—equated with "deprivation", the term used in 1983 to describe the wrongdoing. Nor does Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) allow this argument. In the former, the tort was false arrest and imprisonment—a deliberate act. In the latter, the intrusion was a clear, aggressive and aggravated entry and outrageous search—not an accident.

Specifically, the fact that gross or culpable negligence may under State law substitute for intent does not demand that interpretation of 1983. While *Pierson* permits the interposition of common law *defenses*, the decision embraces under 1983 only a *claim* for a common law tort involving actual intent as distinguishable from a tort merely requiring negligence.

The statute does not contemplate the conversion of every common law responsibility into a 1983 case—certainly not through dependence upon common law fictions. Indeed, the majority cites no authority warranting this per saltum handspring into 1983. Gross or culpable negligence still remains negligence, and the common law picks it up in that sense

solely as a fictional equal of intent. Nothing in the Federal statute impliedly or expressly condones a comparable adaptation.

Otherwise, under 1983 such offenses as *involuntary* manslaughter, or even reckless driving in circumstances, would be actionable as deprivations of civil rights. Given the scope the court now grants it, 1983 would indeed be all-pervasive. As one example, it would allow a State health officer or official physician to be sued for an accident, or for gross and culpable negligence, in treating a patient at a public clinic. Again, a driver of State fire equipment answering an alarm could be sued under 1983 for injuries inflicted on spectators on the street if caused by his negligence, if gross and culpable. Suppose, further, he destroyed, damaged or trespassed upon private property, would he be liable for depriving the owner of his civil rights? Illustrations of this sort are innumerable. The statute would enter into every instance of possible gross carelessness by a State representative in the performance of his duties. This, I believe, was not within the purpose, aim or intendment of the enactment.

While exhaustion of a State remedy is not prerequisite to a suit upon 1983, the opposite seems equally true—every culpable and gross act by a State representative causing injury is not remediable under 1983. Its "purposes [are] several-fold—to override certain kinds of state laws, to provide a remedy where state law [is] inadequate, 'to provide a federal remedy where the state remedy, though adequate in theory, [is] not available in practice' (citation omitted), and to provide a remedy in the federal courts supplementary to any remedy any State might have." McNeese v. Board of Education, 373 U.S. 668, 671–672, 83 S.Ct. 1433, 1435, 10 L.Ed.2d 622 (1963).

In my appraisement the facts now related in the court's opinion do not bring the case for 1983 under any of these contingencies, so I dissent from any reliance upon it.